ELECTRONICALLY FILED
8/31/2026 2:22 PM
70-CV-2026-900097.00
CIRCUIT COURT OF
TALLAPOOSA COUNTY, ALABAMA
PATRICK CRADDOCK, CLERK

**IN THE CIRCUIT COURTR OF TALLAPOOSA COUNTY, ALABAMA**

| | | |
|---|---|---|
| **HEALTHCARE JUSTICE COALITION, LLC,**<br>***Plaintiff*,**<br><br>**v.**<br><br>**BLUE CROSS AND BLUE SHIELD OF ALABAMA, AND JOHN DOES 1-20**<br>***Defendants.*** | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **Case No.**<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT**

Plaintiff Healthcare Justice Coalition, LLC ("Healthcare Justice" or "Plaintiff"), for its Complaint and Jury Demand against Defendants Blue Cross and Blue Shield of Alabama and John Does 1-20 (collectively, "Defendants" or "BCBS"), allege as follows:

## I. INTRODUCTION

Unlike virtually every other physician in America, emergency room doctors have no power to choose their patients. Federal and state law strip that choice away entirely as emergency room doctors *must* treat every patient who walks through their doors requiring emergency care—regardless of whether that patient is uninsured and unable to pay a dime, covered by Medicare, covered by Medicaid, or covered by commercial insurance like the plans BCBS sells to its members. This is not a courtesy, it is a legal mandate. And it is precisely because of this mandate that emergency rooms function as the last line of defense—the safety net—for the American healthcare system. Defendants know this, and they have built a business model around it—exploiting the very mandate that forces emergency physicians to treat first and bill later, secure in the knowledge that the doctors who save their members' lives have no leverage to refuse care and, until now, no meaningful check on Defendants' ability to pay them whatever Defendants unilaterally decide.

NES Tennessee Inc. ("NES") was part of the backbone holding up that safety net. Healthcare Justice exists to confront the financial crisis that insurers like BCBS have deliberately engineered and perpetuated by systematically, and knowingly underpaying out-of-network emergency providers. Healthcare Justice fights for fair payment on behalf of healthcare providers and pursues every available legal avenue to end these underpayments. It does so by taking an assignment of claims from providers like NES and then holding health plans such as BCBS accountable paying what they actually owe: fair and reasonable compensation for the critical, often lifesaving services emergency physicians provide their communities.

In this case, BCBS paid NES an average of only 17% of what NES billed for that lifesaving care. This is not an isolated dispute, it is a systematic pattern of underpayment that guts the financial viability of the emergency practice groups America depends on. It is exactly this kind of conduct that drove NES into bankruptcy. NES is not an outlier: insurers' chronic, calculated underpayment forces emergency medicine groups across the country into insolvency or into slashing the coverage they can provide, directly harming patient care in the process.

The consequences fall hardest on all communities in Alabama. When an emergency department closes, patients don't simply lose convenience, they lose time they may not have. They are forced to travel far greater distances for basic emergency care, and for patients suffering strokes, heart attacks, and other life-threatening emergencies, minutes are the margin between survival and death. This is why Healthcare Justice exists: to put a stop to Defendants' underpayment practices and to recover the reasonable payment for emergency services that Defendants have unlawfully withheld, so that qualified physicians can keep doing the work of saving lives, for every American, regardless of their insurance status.

Healthcare Justice brings this suit to hold BCBS accountable for the billed charges, or the reasonable value, of the emergency medical services NES provided to BCBS's own members.

## II. PARTIES

1. Plaintiff Healthcare Justice Coalition, LLC ("HJC," or "Plaintiff") is a limited liability company organized in the State of Delaware with its principal place of business in New York. HJC has a single member, eCure, LLC. eCure, LLC is a limited liability company organized in the State of Delaware with its principal place of business in New York. eCure, LLC has two entity members, Allia 770 Ventures, LLC, a Delaware limited liability company with its principal place of business in New York and Cresson Management, LLC, a Delaware limited liability company with its principal place of business in the United States Virgin Islands. Allia 770 Ventures, LLC has individual members in Alabama, Connecticut, Illinois, Indiana, Kentucky, Minnesota, Michigan, New Mexico, and Pennsylvania. Cresson Management, LLC has individual members in the United States Virgin Island. eCure has individual members in California, New York, and Massachusetts.

2. On information and belief, Defendant Blue Cross and Blue Shield of Alabama ("Defendant") is a corporation licensed to do business in the State of Alabama as a health care service plan with its principal place of business 450 Riverchase Parkway East, Birmingham, Alabama 35244. They may be served through its registered agent Michael Lenard Patterson located at 450 Riverchase Parkway East, Birmingham, Alabama 35244.

3. The true names and capacities of the Defendants sued herein as DOES 1 through 20, inclusive (hereinafter, the "Does" or the 'Doe Defendants"), are unknown to Healthcare Justice at this time, and therefore are sued by such fictitious names. Healthcare Justice will amend this Petition to allege the true names and capacities of these Does when they have been ascertained. Healthcare Justice is informed and believes that each of the Defendants designated as a Doe is responsible in some manner for the events and happenings herein alleged, as well as for the damages alleged.

## III. JURISDICTION AND VENUE

4. Venue is proper in Tallapoosa County because the causes of action set forth below arose, at least in part, in Tallapoosa County. The emergency physicians involved here are all licensed

to practice medicine in Alabama and provided emergency medical services at hospitals, including those located in Tallapoosa County. Healthcare Justice seeks payment for emergency services provided to patients in Alabama, including to residents in Tallapoosa County.

5. This Court has personal jurisdiction over Defendants because they knowingly and purposefully provided and still provide or administer health insurance coverage in Alabama to Alabama residents and others. Defendants are engaged in substantial activity and earn significant revenues within and throughout Alabama, including from residents of Tallapoosa County.

6. Moreover, Blue Cross and Blue Shield of Alabama maintains offices in Alabama.

## IV. FACTUAL BACKGROUND

***Healthcare Justice and NES***

7. NES is among the emergency medicine practice groups with which Healthcare Justice works to hold health plans accountable for making fair, reasonable, and customary payments to emergency physicians for their critical services.

8. In Alabama, during the relevant period, NES provided emergency medical services at Coosa Valley Medical Center, Jack Hughston Memorial Hospital, Monroe County Hospital, Russell Medical Center, and Regional Medical Center of Central Alabama. NES provided these services 24 hours a day, 7 days a week. The services provided by NES to Defendants' members included treatment for life-threatening conditions such as cardiac arrest, trauma, strokes, broken bones, burns, diabetic shock, gastric and obstetrical distress, among many others.

9. In furtherance of its core mission, Healthcare Justice engages with emergency medicine practice groups, like NES, responsible for providing lifesaving healthcare services on an emergency basis. As part of that effort, Healthcare Justice has the emergency physician practice groups, like NES, assign Healthcare Justice underpaid claims and the right to sue for full payment due.

10. Specifically, on August 4, 2023, NES assigned to eCure LLC the right to all of NES's outstanding bills:

> 2. Transfer of Outstanding Bills. Assignor hereby sells to eCure as absolute owner, without recourse to Assignor, the Assignor's rights, remedies, titles, and interest in all present and future Outstanding Bills which includes without limitation those Outstanding Bills that are: (i) owing by the Debtors identified in Exhibit G, and (ii) arising from Underlying Services rendered in the jurisdictions and in the time periods identified in Exhibit G. Each Outstanding Bill submitted to eCure shall be accompanied by such documentation supporting and evidencing the Outstanding Bills, as eCure shall from time to time request. Within sixty (60) days of execution of this Agreement, Assignor shall provide eCure a Schedule of Outstanding Bills, in the form of Exhibit F attached hereto, which offers further details relating to Outstanding Bills purchased hereunder (a "Schedule"). Any failure to provide such information does not limit the Outstanding Bills sold to eCure hereunder. Assignor shall have no liability to eCure for the failure of Debtor to pay any Outstanding Bills when due and payable under the terms applicable thereto solely as a result the Debtor's financial inability to pay. The purchase of Outstanding Bills hereunder shall be subject to the terms and conditions, representations, warranties, covenants, and agreements contained in this Agreement and the Assignment and Assumption Agreement attached hereto as Exhibit E. Upon purchase, (a) eCure shall have all rights, remedies, titles, and interest in and to any and all (i) Outstanding Bills purchased hereunder, and (ii) Indemnified Claims (as defined herein) and causes of action, including without limitation breach of contract, breach of the covenant of good faith and fair dealing, declaratory relief, violation of statutes, negligence, and estoppels that stem from the Outstanding Bills ("Legal Causes of Action"). Notwithstanding the above, eCure does not and shall not assume, become liable for or obligated for any of Assignor's obligations, liabilities or indebtedness whatsoever, whether known or unknown, direct, contingent or otherwise, related to or associated with any Outstanding Bills or their assignment herein, including but not limited to any allegations or claims of negligent services, malpractice, breach of contract, and/or improper or fraudulent billing asserted by any patient of Assignor, any health care facility at which Assignor provides or has provided services, any insurance company or plan to whom Assignor submits Outstanding Bills, or any other party (all such liabilities and obligations of Assignor are referred to as the "Excluded Liabilities").

11. The transfer of all Outstanding Bills to eCure LLC included the following rights:

> 2.1. "Outstanding Bills" means (a) those outstanding bills and accounts of Assignor (i) for which Assignor has not received payment in full for Underlying Services; (ii) that arose from Underlying Services that Assignor performed during a period in which Assignor did not have any kind of payor or other agreement directly with the Debtor or that were processed through a third party arrangement leaving an unsettled balance (including, without limitation, any form of "silent PPO," "leased network," or "umbrella network" form of arrangement), such that Assignor was an out-of-contract provider and would not be limited to a contracted or discounted rate for the Unpaid Procedures (as defined below) rendered to Patients, and (ii) that remain unpaid for more than three hundred sixty five (365) days after the Underlying Services were rendered, and (b) all Related Claims. "Debtor" means an insurance company, other company, association, plan, governmental entity or unit, or any other entity (other than a Patient) that is obligated in whole or in part to pay Assignor, or otherwise makes payment, administers payment, or is involved in any way in determining the amount of payment or whether a claim should be paid to Assignor, for Unpaid Procedures; this definition shall be interpreted as broad as possible to include all entities or parties known or unknown that have any involvement whatsoever in dealing with the reimbursement for medical services provided by Assignor. "Unpaid Procedures" means any Underlying Services, including without limitation evaluations, management services, and other medical, professional, and facility services, for which Assignor has not received payment in full. "Related Claims" means all of Assignor's claims against Debtors relating to and/or arising from the Outstanding Bills, to the extent not already implicitly assigned pursuant to subsection (a) of this Section 2.1, including but not limited to all (i) contract claims, (ii) Commercial Tort Claims (as defined in the UCC, "Commercial Tort Claims"), including but not limited to Commercial Tort Claims described in Exhibit J, (iii) claims under any unfair competition or unfair trade practices statutes in effect in any jurisdiction, (iv) fraud claims, (v) civil RICO and racketeering claims, and (vi) antitrust claims, along with the right and ability to pursue any remedy available under any such claims, including but not limited to damages, equitable relief (such as, but not limited to, injunctive relief, restitution, and surcharge), declaratory relief, statutory penalties, punitive damages, and attorney's fees.

12. Subsequently, eCure LLC assigned and transferred all of its rights to Healthcare Justice:

> **ASSIGNMENT AND ASSUMPTION AGREEMENT**
>
> THIS ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Assignment Agreement") is by eCure, LLC (the "Assignor") to Healthcare Justice Coalition, LLC (the "Assignee") effective December 1, 2025.

> 1. The Assignor hereby assigns and transfers to the Assignee all of the Assignor's rights, remedies, title, and interests in the Outstanding Bills. For the avoidance of doubt, this assignment and transfer the Outstanding Bills listed in the schedule attached hereto..
>
> 2. The Assignee hereby accepts the foregoing assignment.

13. Once Healthcare Justice has received the assignment, it pursues actions like this one to ensure the proper payment for the out-of-network emergency services provided by NES to BCBS's members in this state. Systemic underpayments by health plans threaten the stability of America's health care system by forcing emergency practice groups into bankruptcy or dire financial positions. Even when practice groups are not bankrupted, providers may still be forced to significantly reduce coverage, negatively impacting patient care—especially in rural and medically underserved areas. Not only does Healthcare Justice's work help put money back into the hands of emergency room doctors providing emergency care, but it also provides a nationwide counterbalance to the insurance companies relentless efforts to solely improve their profits by paying emergency room doctors less and less each year.

***In-Network v. Out-of-Network***

14. In general, physicians can, but are not obligated to, enter into formal contractual arrangements with health care service plans, insurers, and other payors. Under such formal contracts, the provider agrees to accept less than its normal billed charges in exchange for the various benefits of being contracted with health care plans such as certainty of payment, payment terms (i.e., within 30

days), volume steerage, and other similar benefits. This formal written contractual arrangement is referred to as being "in-network."

15. Physicians are often willing to enter into an agreement but are forced to operate "out-of-network" because the health plan simply refuses to contract with them, or to offer reasonable contract terms. In this "out-of-network" scenario, physicians do not receive any of the benefits described above and have not agreed in advance to any reduced reimbursement rates with the payor. They therefore are not compelled to accept whatever the health plan chooses to pay for healthcare services rendered and are entitled to bill for the value of the physician services rendered. Where a health plan declines to pay out-of-network physician's reasonable charges, then, the physician is entitled to seek a commercially reasonable payment.

16. In this case, NES did not have written contracts with Defendants for the applicable period. NES timely billed Defendants for its emergency services and provided those services with a reasonable expectation of being paid a fair and appropriate amount, and Defendants determined that NES's claims were covered and medically necessary under the health plans. NES never agreed to accept any discounted rate from Defendants or otherwise be bound by Defendants payment policies or rate schedules for "in-network" providers.

17. Defendants must therefore pay Plaintiff for emergency services based on the reasonable value for the services at issue, including up to the full billed charges.

18. Defendants, however, either failed to pay anything at all[1] or paid much less than the reasonable value and/or the full billed charges for the emergency services rendered to Defendants' members.

---

[1] In filing this Lawsuit, Healthcare Justice explicitly chooses not to pursue any right of cause of action based on the Employee Retirement Income Security Act of 1974 ("ERISA") or the Medicare Act. Healthcare Justice pursues each of the causes of action below as the assignee of the emergency physicians' direct right to reimbursement from Defendants. By this Lawsuit, Healthcare Justice does not seek to pursue any derivative right to ERISA benefits under any ERISA-governed health benefit plan or Medicare benefits under any Medicare Advantage plan, and specifically disclaims any intent to assert, in this action, any derivative right to benefits from any self-funded ERISA-governed plan or any Medicare Advantage plan or any delegee of such plan. Healthcare Justice does not seek recovery of any claims subject to ERISA where Defendants denied the claim

19. As discussed above, Healthcare Justice has been assigned the rights to NES's claims at issue and has the necessary rights and authority to sue to recover the reasonable value up to the full billed charges and all additional rights related to the claims.

***Emergency Room Physicians Must Render Emergency Medical Care***

20. No matter if an emergency physician is "in-network" or "out-of-network," and no matter if a patient can pay for services, physicians practicing in hospital emergency departments, such as NES, are required by federal law to render lifesaving emergency health care services to any patient seeking such services under the Emergency Medical Treatment and Labor Act ("EMTALA"). *See* 42 U.S.C. § 1395dd.

21. Similarly, Alabama state law requires Defendants to cover emergency services for all their insureds and considers it a basic healthcare service. *See, e.g.,* ALA. CODE §§ 27-21A-3(b)(3), 21A-1(2). Defendants must provide such emergency services coverage irrespective of whether a provider of emergency services has agreed to be "in-network" as part of Defendants provider network.

22. Defendants similarly market their insurance products as covering emergency care, 24 hours a day, 7 days a week, anywhere in the county, and without the need to obtain prior approval for emergency services.

***The Claims At Issue***

23. There are currently over 69,000 medical claims at issue. Defendants have underpaid those claims by more than $50 million, excluding interest. Of the amounts due related to NES's emergency services, approximately 95% of the dollars sought are for just six CPT codes: 99285, 99284, 99283, 99291, 99053, 93010. This is unsurprising as a majority of the CPT[2] codes in an emergency room typically fall within a small number of codes.

---

for any coverage issue. Therefore, there are no issues in this lawsuit where there is a challenge to the "right to payment" which would invoke ERISA. *See Rutledge v. Pharmaceutical Care Management Association*, 592 U.S. 80 (2020).

[2] The Current Procedural Terminology ("CPT") codes offer doctors and health care professionals a uniform language for coding medical services and procedures to streamline reporting and to increase accuracy and efficiency. The CPT

24. For the medical claims at issue, Defendants paid only approximately 17% of the aggregate charges NES billed for its services.

25. The following illustrates how a dispute over payment for emergency services can materialize. In this example, a patient goes to hospital emergency room in the evening with severe chest pain and pain and sensation of tightening in the left arm. These symptoms suggest a likely heart attack. An emergency physician would promptly assess and treat a patient with these symptoms, including ordering a full set of cardiac tests. In this illustration, the emergency physician may later submit a bill to the patient's insurer for $2,000 for professional services. This bill could reflect charges from the emergency consultation, for the cardiac tests and for the services being rendered at night in the 24-hr facility. The insurer, however, may only allow $400 (or in some cases even less), or 20% of the physician's fair and reasonable billed charges. Thus, the amount of payment in dispute in this scenario is $1,600—the difference between the $2,000 the emergency physician billed for professional services and the $400 payment by the insurer for the services.

26. Healthcare Justice will provide a list of assigned underpaid claims upon request and with appropriate confidentiality protections. This list has not been attached to this Lawsuit to avoid disclosing Protected Health Information under HIPAA.

***The Slashing of Emergency Physician Reimbursement***

27. Defendants' unilateral, across-the-board slashing of reimbursement rates is a scheme to enrich themselves at the direct expense of the emergency physicians who have no choice but to render care. Defendants have used and implemented a variety of methods to suppress reimbursement rates and generate additional fees above and beyond the per member per month fees they receive for administering both their fully insured and self-funded insurance plans. These programs go by a variety

terminology is the most widely accepted medical nomenclature used across the country to report medical services (including emergency services) to public and private health insurance programs.

of names but have become known as "shared savings" programs in the industry[3]. Most of the programs are implemented by Defendants themselves, although Defendants also use a similar program known as Data iSight and other programs administered by MultiPlan, Inc.

28. Under these "shared savings" programs, Defendants take a percentage of the difference between the amount that would have otherwise been payable to the out-of-network provider (the billed charge) and the amount allowed or paid by Defendants to adjudicate the claim.

29. In these circumstances, Defendants receive anywhere from 20% to 50% of the difference between the provider's billed charge and the amount allowed by Defendants ("Savings Obtained").

30. By way of example, if an emergency care provider charged $2,000 for the service, and Defendants adjudicated the claim and allowed the provider $400 dollars, the "Savings Obtained" would be the difference between those two amounts, or $1,600. Defendants then charge their clients a fee on that $1,600, typically between 20% and 50%. In this example, and assuming a 35% fee, Defendants would have generated a fee greater than it paid the provider for the emergency care provided (i.e. 35% x $1,600 = $560, compared to the $400 allowed or paid to the provider). This is on top of the fee that Defendants already receive for their services.

31. Defendants use similar programs, whether they receive a fee or not, to unilaterally cut reimbursement to out-of-network emergency providers.

32. The volume of claims processed under these programs generates millions of dollars annually for Defendants. All of these "shared savings" fees and programs are generated by providing

[3] *See, e.g.*, *https://www.acr.org/Clinical-Resources/Publications-and-Research/ACR-Bulletin/sharing-is-not-always-caring*; *https://www.mercer.com/en-us/insights/us-health-news/shared-savings-programs-require-closer-inspection/*; *https://thecapitolforum.com/provider-shows-how-multiplan-incentivizes-him-to-raise-his-billing-rate-multiplan-says-it-does-not-encourage-providers-to-overcharge/*; *https://www.nytimes.com/2024/04/07/us/health-insurance-medical-bills-takeaways.html*.

the same service for which Defendants are already being compensated—namely, the receipt, processing and adjudication of medical claims.

33. Defendants have also opted to use MultiPlan, including its program offerings, including at least Data iSight, to institute its various "shared savings" fees and programs. Defendants used MultiPlan because they knew, based on MultiPlan's marketing and on meetings between Defendants and MultiPlan, that the payment rates Data iSight would produce would be artificially low. Moreover, as part of the Data iSight "methodology," MultiPlan gave Defendants the ability to override any methodology and dictate the reimbursement rate. Thus, while Defendants were publicly representing that the payment rates were the result of the Data iSight methodology, that representation was false.

34. Defendants' significant underpayment scheme was a direct, substantial, and entirely foreseeable cause of NES's ultimate declaration of bankruptcy on September 18, 2023—a collapse Defendants could have avoided at any time simply by paying NES what it was legally owed.

## V. CAUSES OF ACTION

### Count 1: Unjust Enrichment

35. Healthcare Justice incorporates by reference all allegations set forth above as though set forth in full here.

36. Under Alabama law, to prevail on a claim of unjust enrichment, a plaintiff must show that: (1) the defendant knowingly retained a benefit; (2) provided by another; and (3) who has a reasonable expectation of compensation.

37. As alleged above, NES provided emergency medical services to insureds of Defendants in good faith.

38. Defendants knew that NES would provide emergency medical services, as they were required to under both Federal and Alabama law.

39. NES fulfilled that obligation by providing the emergency medical care. Defendants undertook the obligation to pay NES for such services—albeit they paid at a significantly reduced rate.

40. Defendants, as well as their insureds, benefitted from the services the emergency physicians provided. For example, without limitation, the insurers used and enjoyed the benefit of the emergency physicians' services because the emergency physicians helped Defendants discharge their legal and contractual obligations to their insureds to provide emergency care. Defendants also received substantial additional benefits as a result of their "shared savings" programs and other offerings by directly pocketing additional money for themselves by knowingly slashing reimbursement to NES below its reasonable value.

41. The benefits Defendants received from the emergency medical care provided to their insureds is significant. In exchange for premiums and other compensation, Defendants assume a duty to provide coverage to their insureds for emergency medical services. Satisfying this essential obligation is a material benefit to Defendants.

42. As a result, where emergency physician providers such as NES are required by law to treat patients in an emergency room, insurers such as Defendants are unjustly enriched when they fail to pay the providers in full for delivering the emergency care necessary to their insureds.

43. Healthcare Justice, including the emergency physicians it collaborates with like NES, justifiably expected to be reasonably compensated for the medical services they provided to patients covered by Defendants insurance plans.

44. Defendants accepted the medical services and care the emergency physicians provided.

45. The reasonable value of the emergency medical services at issue and delivered to Defendants' insureds is reflected in the amount the emergency physicians charged for such services.

46. Defendants paid for the services underlying the claims at issue at rates substantially lower than the reasonable value of the services provided.

47. Defendants' failure to reimburse NES for the reasonable value of the services at issue, comes at the emergency physicians' expense, and enriches Defendants by the difference between the reasonable value of the services provided and the amounts Defendants paid.

48. It would be inequitable, unconscionable, and contrary to good conscience to permit Defendants to retain the amount at issue, particularly where Defendants knowingly and deliberately paid far less than the reasonable value of lifesaving care they were legally obligated to cover. Healthcare Justice (through its assignment from NES) is entitled to recover the full difference between the reasonable value of the services provided and the paltry, below-market amounts Defendants paid. Justice and equity demand that Defendants reimburse the emergency physicians in full for the emergency services rendered to Defendants' insureds from July 2020 to present.

**Count 2: Quantum Meruit/Implied in Law Contract**

49. Healthcare Justice incorporates by reference all allegations set forth above as though set forth in full here.

50. Under Alabama law, to prevail on a claim of quantum meruit, a plaintiff must show that: (1) the defendant knowingly retained a benefit; (2) provided by another; and (3) who has a reasonable expectation of compensation.

51. As alleged above, NES provided emergency medical services to insureds of Defendants in good faith.

52. Defendants knew that NES would provide emergency medical services, as they were required to under both Federal and Alabama law.

53. NES fulfilled that obligation by providing the emergency medical care. Defendants undertook the obligation to pay NES for such services—albeit they paid at a significantly reduced rate.

54. Defendants, as well as their insureds, benefitted from the services the emergency physicians provided. For example, without limitation, the insurers used and enjoyed the benefit of the emergency physicians' services because the emergency physicians helped Defendants discharge their legal and contractual obligations to their insureds to provide emergency care. Defendants also received additional benefits as a result of their "shared savings" programs and other offerings by directly pocketing additional money by slashing reimbursement to NES.

55. The benefits Defendants received from the emergency medical care provided to their insureds is significant. In exchange for premiums and other compensation, Defendants assume a duty to provide coverage to their insureds for emergency medical services. Satisfying this essential obligation is a material benefit to Defendants.

56. As a result, where emergency physician providers such as NES are required by law to treat patients in an emergency room, insurers such as Defendants are unjustly enriched when they fail to pay the providers in full for delivering the emergency care necessary to their insureds.

57. Healthcare Justice, including the emergency physicians it collaborates with like NES, justifiably expected to be reasonably compensated for the medical services they provided to patients covered by Defendants insurance plans.

58. Defendants accepted the medical services and care the emergency physicians provided.

59. The reasonable value of the emergency medical services at issue and delivered to Defendants' insureds is reflected in the amount the emergency physicians charged for such services.

60. Defendants paid for the services underlying the claims at issue at rates substantially lower than the reasonable value of the services provided.

61. Defendants' failure to reimburse NES for the reasonable value of the services at issue, comes at the emergency physicians' expense, and enriches Defendants by the difference between the reasonable value of the services provided and the amounts Defendants paid.

62. It would be against equity and good conscience to permit Defendants to retain the amount at issue because Healthcare Justice (through its assignment from NES) is entitled to such amounts which represent the difference between the reasonable value of the services provided and the paltry amounts Defendants paid for such services. Justice and equity require Defendants reimburse the emergency physicians in full for the emergency services rendered to Defendants' insureds from July 2020 to present.

**Count 3: Implied in Fact Contract**

63. Healthcare Justice incorporates by reference all allegations set forth above as though set forth in full here.

64. Under Alabama law, a contract implied in fact requires the same elements as an express contract, and differs only in the method of expressing mutual assent. The basic elements of a contract are (1) offer and acceptance; (2) consideration; and (3) mutual assent. Mutual asset may be understood from the circumstances and need not be explicit.

65. Defendants routinely represent that their insureds can go to any hospital emergency room when they need covered care. Defendants similarly represent that such emergency room care will be covered, no matter if the patient's insurer is out-of-network.

66. NES rendered medically necessary and lifesaving emergency services, and in doing so reasonably expected full compensation from Defendants.

67. NES and Defendants conveyed, by their course of conduct and in the context of the circumstances of their relationship, that Defendants would pay for emergency medical services provided.

68. Defendants conveyed, by their course of conduct and dealing, that they would also hold their members harmless. To do so, Defendants must pay a reasonable value for the emergency services rendered by NES.

69. A reasonable person in Defendants' position would know or should have known that NES was performing the services expecting that Defendants would pay for them appropriately. As alleged, Healthcare Justice has an assignment of accounts receivables owed by Defendants for the reasonable value of NES's services.

70. Plaintiff is entitled to a judgment against Defendants based on their knowing and material breach of their implied in fact contract with the emergency physicians. As a direct and

proximate result of Defendants, Healthcare Justice (through their assignment from NES and its bankruptcy trustee) suffered damages in an amount to be proven at trial but reasonably believed to be the difference between the billed charges or reasonable value for the services provided to the insureds and the amount Defendants already paid on the claims from July 2020 to present.

## CONCLUSION

WHEREFORE, Plaintiff, by counsel, respectfully requests the Court enter judgment in its favor and against Defendants in amounts to be proven at trial, plus interest, the costs of this action, and all other appropriate relief.

*Respectfully Submitted,*

*/s/ Robert D. Segall*
Robert D. Segall (SEG003)
J. David Martin (MAR120)
COPELAND, FRANCO, SCREWS & GILL, P.A.
Post Office Box 347
444 South Perry Street (36104)
Montgomery, Alabama 36101-0347
T: 334.834.1180 F: 334.834.3172
Email: segall@copelandfranco.com
Email: martin@copelandfranco.com

FOSTER YARBOROUGH KILLINGSWORTH PLLC

*/s/ Michael Killingsworth*
Michael Killingsworth (*pro hac vice forthcoming*)
Benjamin Foster (*pro hac vice forthcoming*)
Patrick Yarborough (*pro hac vice forthcoming*)
Carmen Lechin (*pro hac vice forthcoming*)
440 Louisiana, Suite 1800
Houston, TX 77002
(713) 331-5254 telephone
(713) 513-5202 facsimile

***Attorneys for Plaintiff***

## DEMAND FOR JURY TRIAL

Plaintiff respectfully demands a trial by struck jury for all issues so triable as allowed by law.

/s/ Robert D. Segall
Of Counsel

**DEFENDANT TO BE SERVED VIA CERTIFIED MAIL:**

Blue Cross and Blue Shield of Alabama
Attention: Michael Lenard Patterson
450 Riverchase Parkway East
Birmingham, AL 35244

UNIFIED JUDICIAL SYSTEM
TENNESSEE MISSISSIPPI GEORGIA FLORIDA
A.D. 1973
STATE OF ALABAMA

# NOTICE TO CLERK

REQUIREMENTS FOR COMPLETING SERVICE BY
CERTIFIED MAIL OR FIRST CLASS MAIL

IN THE CIRCUIT COURT OF TALLAPOOSA COUNTY, ALABAMA
HEALTHCARE JUSTICE COALITION, LLC V. BLUE CROSS AND BLUE SHIELD OF ALA

70-CV-2026-900097.00

To: CLERK ALEX CITY
clerk.alexcity@alacourt.gov

TOTAL POSTAGE PAID: $12.76

Parties to be served by Certified Mail - Return Receipt Requested

BLUE CROSS AND BLUE SHIELD OF ALABAMA — Postage: $12.76
C/O MICHAEL L PATTERSON
450 RIVERCHASE PARKWAY E
BIRMINGHAM, AL 35244

Parties to be served by Certified Mail - Restricted Delivery - Return Receipt Requested

Parties to be served by First Class Mail

9589 0710 5270 4421 8635 86

U.S. Postal Service™
CERTIFIED MAIL® RECEIPT
*Domestic Mail Only*

For delivery information, visit our website at *www.usps.com®*.

OFFICIAL USE

Certified Mail Fee
$
Extra Services & Fees *(check box, add fee as appropriate)*
☐ Return Receipt (hardcopy) $
☐ Return Receipt (electronic) $
☐ Certified Mail Restricted Delivery $
☐ Adult Signature Required $
☐ Adult Signature Restricted Delivery $
Postage
$12.76
Total Postage and Fees
$
Sent To
Blue Cross Blue Shield
Street and Apt. No., or PO Box No.
450 Riverchase Parkway E
City, State, ZIP+4®
Birmingham AL 35244

Postmark Here

Received
AUG 2026
Patrick Craddock
Circuit Clerk

PS Form 3800, January 2023 PSN 7530-02-000-9047 See Reverse for Instructions

# NOTICE TO CLERK

REQUIREMENTS FOR COMPLETING SERVICE BY
CERTIFIED MAIL OR FIRST CLASS MAIL

IN THE CIRCUIT COURT OF TALLAPOOSA COUNTY, ALABAMA
HEALTHCARE JUSTICE COALITION, LLC V. BLUE CROSS AND BLUE SHIELD OF ALA

70-CV-2026-900097.00

To: CLERK ALEX CITY
clerk.alexcity@alacourt.gov

TOTAL POSTAGE PAID: $12.76

Parties to be served by Certified Mail - Return Receipt Requested

BLUE CROSS AND BLUE SHIELD OF ALABAMA — Postage: $12.76
C/O MICHAEL L PATTERSON
450 RIVERCHASE PARKWAY E
BIRMINGHAM, AL 35244

Parties to be served by Certified Mail - Restricted Delivery - Return Receipt Requested

Parties to be served by First Class Mail

9589 0710 5270 4421 8635 86

U.S. Postal Service™
CERTIFIED MAIL® RECEIPT
*Domestic Mail Only*

For delivery information, visit our website at *www.usps.com®*.

OFFICIAL USE

Certified Mail Fee
$

Extra Services & Fees *(check box, add fee as appropriate)*
☐ Return Receipt (hardcopy) $
☐ Return Receipt (electronic) $
☐ Certified Mail Restricted Delivery $
☐ Adult Signature Required $
☐ Adult Signature Restricted Delivery $

Postage
$12.76

Total Postage and Fees
$

Postmark Here

Received
AUG 2026
Patrick Craddock
Circuit Clerk

Sent To
Blue Cross Blue Shield

Street and Apt. No., or PO Box No.
450 Riverchase Parkway E

City, State, ZIP+4®
Birmingham AL 35244

PS Form 3800, January 2023 PSN 7530-02-000-9047 See Reverse for Instructions